O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICARDO MATHEWS,<br><br>                    Petitioner,<br><br>    v.<br><br>DEBBIE ASUNCION, Warden,<br><br>                    Respondent. | Case No.  2:17-cv-08378-KES<br><br>MEMORANDUM OPINION AND<br>ORDER |

**I.**

**INTRODUCTION**

On November 14, 2017, Ricardo Mathews ("Petitioner") filed a counselled Petition for Writ of Habeas Corpus by a Person in State Custody pursuant to 28 U.S.C. § 2254 (the "Petition").  (Dkt. 1.)  Petitioner is a California state prisoner currently serving a sixteen-year sentence after a jury convicted him of assault, robbery, and other crimes arising out of Petitioner's confronting guests at a hotel while pretending to be a member of the guest services staff.  (Id. at 1); People v. Mathews, 2016 Cal. App. Unpub. LEXIS 6804 (Sep. 15, 2016).  Respondent filed an answer to the Petition on April 4, 2018.  (Dkt. 24.)  Respondent also submitted lodged documents ("LD"), including the Reporter's Transcript ("RT") and Clerk's

Transcript ("CT") from Petitioner's trial.  (Dkt. 25.)  Respondent also lodged a CD of video evidence.[1]  (Dkt. 30.)  On June 14, 2018, Petitioner filed a traverse.  (Dkt. 28.)

For the reasons discussed below, the Petition is denied.

## II.

## CLAIM PRESENTED

Petitioner voluntarily dismissed his ineffective assistance of counsel claim. (Dkt. 21.)  As his sole remaining claim for relief, Petitioner asserts that the trial court violated his Due Process rights by refusing to give a requested instruction on self-defense.  (Dkt. 1 at 7.)

## III.

## FACTUAL BACKGROUND

**A.      The Court of Appeal's Summary of the Evidence.**

The underlying facts are taken from the unpublished California Court of Appeal decision on Petitioner's direct appeal.  (LD 6); <u>Mathews</u>, 2016 Cal. App. Unpub. LEXIS 6804 (2016).  Unless rebutted by clear and convincing evidence, these facts may be presumed correct.  <u>Tilcock v. Budge</u>, 538 F.3d 1138, 1141 (9th Cir. 2008); 28 U.S.C. § 2254(e)(1).

*A. Prosecution Evidence*

*[P]rosecution witnesses provided the following testimony: On the night of May 5, 2014, Bradley Clemm and Stefanja Pytel, who were guests staying in room 305 of the Luxury Lofts Hotel in Santa Monica, went to sleep in their room.*

---

[1] On appeal, Petitioner identified three clips of video evidence as relevant to his self-defense claim: (1) Third Floor 1.20140506.034015.MP4 ("Video 1"), (2) Third Floor 1.20140506.034040 ("Video 2"), and (3) Third Floor 1.20140506.034050 ("Video 3").  (LD 3 [Dkt. 25-6 at 13-14].)  The Court of Appeal's description of "the first video" corresponds to Video 1.  The Court of Appeal's description of "another video" corresponds to Video 3.

2

*Around 2:00 a.m., Pytel was awakened by the sound of someone yelling "guest*
*services" in the hallway outside their room. She heard the sound of the door to the*
*room being unlocked, then [Petitioner] entered the room. He stood at the end of*
*the bed, wearing only long underwear bottoms and a beanie.*

*Pytel sat up in the bed and said, "Excuse me. Can I help you?" This woke*
*Clemm, who asked [Petitioner] who [Petitioner] was and told [Petitioner] to get*
*out. [Petitioner] backed out of the room towards the doorway, asked if they were*
*porn stars, and said he was from "guest services."[2] Clemm said [Petitioner] had*
*the wrong room and told [Petitioner] to leave and not come back. [Petitioner] had*
*a bowl of keys on the floor near his feet, which he picked up. [Petitioner] said he*
*would be back later. Clemm closed and locked the door. Pytel called the hotel*
*manager, who told her that the police had been notified.*

*About 20 minutes later, Clemm heard a key slide into the lock and could*
*hear the key turning the lock. Clemm went to the door and opened it. [Petitioner]*
*was standing by the door. Clemm asked [Petitioner] for the key, but [Petitioner]*
*took the key, walked down the hall, and began trying keys in another door. Clemm*
*followed [Petitioner] down the hall, asking several times for [Petitioner] to give*
*him the key to Clemm and Pytel's room. Pytel came out into the hallway and also*
*asked [Petitioner] to give them the key. Pytel told Clemm, "Grab the keys from*
*him so he can't come back in." [Petitioner] responded, "I wouldn't do that if I*
*were you."*

*According to Clemm, [Petitioner] walked past Clemm and pushed Pytel.*
*Clemm told [Petitioner] not to push Pytel.[3] [Petitioner] turned and hit the right side*

---

[2] *[Petitioner] submitted evidence in support of his motion to strike his prior*
*conviction that he had a history of mental health issues, exacerbated by drug use*
*and homelessness.*

[3] *Pytel did not testify that [Petitioner] pushed her.* [The prosecution asked
Pytel if Petitioner shoved her before he punched Clemm, but the trial court

3

*of Clemm's mouth with his fist. According to Clemm, the hit was "really, really*

*hard." Clemm lost his balance and fell to the ground. [Petitioner] hit him three*

*more times in the face, leaving a "big hole" above his lip. [Petitioner] also*

*repeatedly stomped on Clemm's head and punched Clemm. At some point, Clemm*

*lost consciousness.*

*[Petitioner] told Clemm, "[g]et up, punk." Pytel tried to push [Petitioner]*

*off of Clemm and yelled at [Petitioner] to stop. [Petitioner] approached Pytel and*

*gave her a "terrifying look." Pytel picked up her cell phone, called 911, and told*

*[Petitioner] that she was calling the police. [Petitioner] tried to grab the phone,*

*knocking Pytel's arm into the wall and causing the phone to fall to the ground.*

*Both Pytel and [Petitioner] lunged for the phone, but [Petitioner] was able to grab*

*the phone before Pytel. [Petitioner] jumped over Clemm, who was still on the*

*ground, and left with Pytel's cell phone.*

*Clemm heard Pytel say, "[g]et up, get up, he's stolen my phone." Clemm*

*managed to get back on his feet and returned with Pytel to their hotel room. The*

*police arrived about 10 minutes later. They took Clemm downstairs, where he*

*identified [Petitioner].*

*Later, during the day of May 6, Clemm went to the doctor and received 10*

*stitches to close the hole in his lip. He also had a severe headache and received a*

*prescription for painkillers. About two days after the incident, Clemm and Pytel*

*went to Hawaii for a vacation, but Clemm was in such pain that they cut their*

*vacation short and returned home.*

*Santa Monica Police Officer Matthew Lieb and others responded to a call at*

*the hotel and discovered [Petitioner] on the second floor. [Petitioner] did not*

---

sustained defense counsel's "leading" objection, and the prosecution did not
rephrase the question. (2 RT 125.) Pytel later testified that she did not remember
whether Petitioner shoved her before he first punched Clemm, but that Petitioner
"did something . . . in, like, seconds." (2 RT 148-49.)]

4

have any identification on him but invited the officers to room 203, where [Petitioner] had been staying. Inside the room, Officer Lieb saw a basket full of maintenance materials and the bowl of keys.

According to Babak Mortazavi, the owner of the Luxury Lofts Hotel, [Petitioner] was not a registered guest at the hotel. The bowl of keys was normally kept locked up at the hotel. One of the rooms at the hotel was used as an office, and employees had an access code to gain entrance to the room. There was no staff on duty at the hotel after 7:00 p.m. When Mortazavi received a call from a guest about the incident at the hotel, he asked his assistant, Lazlo Vandor, to go to the hotel to investigate the problem. Vandor arrived at the hotel to find the police were already there. The police took Vandor to room 203, where they had [Petitioner] detained. Although the room was supposed to be empty, Vandor saw a duffle bag resembling those used at the hotel for laundry. Vandor checked the hotel's maintenance area and discovered the locker where the spare keys were kept had been ripped open.

Video recordings of the attack were played for the jury. The first video recording captured Clemm pursuing [Petitioner] around a corner in the hallway and grabbing at [Petitioner].[4] [Petitioner] turned and punched Clemm in the face. After Clemm fell to the ground, [Petitioner] punched Clemm in the face several more times and stomped repeatedly on Clemm's head. Pytel could be heard in the background on the video telling Clemm to get up. [Petitioner] walked out of view of the camera toward Pytel. Clemm tried to get up; [Petitioner] walked back into view and punched Clemm again. He again walked toward Pytel and then returned, leaned over Clemm and said, "[g]et up, punk."

---

[4] According to Clemm, before he pursued [Petitioner] around the corner, coming into view of the camera, [Petitioner] pushed Pytel and then punched Clemm, which was not captured by the camera.

5

1    *Another video recording showed [Petitioner] holding a cell phone in his hand*
2    *while Pytel was asking [Petitioner] to give the phone back to her, Clemm struggling*
3    *to get up, [Petitioner] jumping over Clemm, who was still on the ground, and*
4    *[Petitioner] leaving the area through a doorway at the end of the hallway.*

5    *B. Defense Evidence*

6    *[Petitioner] did not testify or present any other evidence.*

7    (LD 6 [Dkt. 25-9 at 2-5].)

8    **B.    Additional Evidence Relevant to Petitioner's Claim.**

9    **1.    Clemm's Testimony.**

10   Clemm described the hotel's hallway as T-shaped with one hallway forming

11   the "stem" of the T and a second, shorter hallway forming the "crossbar" of the T.

12   (2 RT 43, 51, 105.)  The two room doors on that floor were along the crossbar

13   hallway, facing each other.  (2 RT 52, 103, 105-06.)  There were no room doors

14   along the stem hallway.  (2 RT 52.)  The "majority of the assault" happened "in the

15   hallway going towards the rooms," i.e., the stem hallway.  (2 RT 51-52.)  A

16   surveillance camera was angled to record the stem hallway.  (2 RT 104.)

17   Petitioner's push of Pytel and initial punch hitting him happened in the crossbar

18   hallway.  (2 RT 43-46, 53, 97.)  Consistent with this, Petitioner's trying to open the

19   other room door on the same floor with numerous keys, pushing Pytel, and initially

20   punching him were not captured on the video.  (2 RT 94, 96-98.)

21   Clemm saw Petitioner push Pytel against the crossbar hallway wall and told

22   him, "Don't push my girlfriend."  (2 RT 45, 93-94, 111.)  Petitioner walked back

23   to Clemm and delivered the first punch; Petitioner "smashed [Clemm] right across

24   the face."  (2 RT 45.)  Concerning that first punch, Clemm testified, "First one I

25   remember was really, really hard.  And then I lost my balance, then he pushed me

26   to the ground, and then he punched me numerous times."  (2 RT 46.)  After Clemm

27   lost his balance, he was "kind of leaning against the wall," at which point

28   Petitioner hit his face "another three times."  (Id.)  He also said, "I fell to the

ground, and I was kind of leaning on the wall," referring to the same point in time. (Id.)  After that, he did not remain leaning against the wall; he eventually ended up lying face-down on the floor in the stem hallway.  (2 RT 47-48.)  After the first punch, Clemm moved from the crossbar hallway into the video screen of the stem hallway.  (2 RT 104.)  He testified that Petitioner was punching him and pushing him into the stem hallway.  (2 RT 105.)  Once Clemm was lying on the floor in the stem hallway, Petitioner stomped on his head until Clemm lost consciousness.  (2 RT 48.)  Petitioner ordered Clemm, "Get up, punk!" but Clemm could not.  (2 RT 50.)

### 2.  Pytel's Testimony.

Pytel saw Petitioner's first punch hit Clemm.  (2 RT 124.)  The punch "caught [Clemm] off guard" and "he stepped back," but Petitioner "kept on swinging [at] him which caused [Clemm] to do this really weird twist, and then [Clemm] knocked into the corner of the wall and then he fell on his front."  (2 RT 124-25.)

When Petitioner took Pytel's phone, "he somehow pushes or … like does that to my arm that it knocks – my arm knocked into a wall …."  (2 RT 129.)  "It was like he pushed it [her arm]."  (2 RT 131.)  Her arm hit decorative molding on the wall, causing a cut and a scar.  (Id.)  This push appears to have occurred during the events shown in Video Three.

### 3.  The Video Evidence.

The same camera recorded Videos 1, 2, and 3 – a third-floor camera located at the intersection of the crossbar and stem of the T, angled to record the stem.  If the camera is considered the center of a compass, then the cross bar ran east-west and the camera pointed north looking up the stem hall, i.e. W $\perp$ E.  All three video clips show the stem hall and the corners of the walls on both sides where the stem hall meets the crossbar.

a.     Video 1.

This is a 25-second video.  In second 1, the clip shows Petitioner and Clemm coming from the "east" segment of the crossbar around the corner and into the stem hall.  Both men are on their feet and moving quickly, facing each other at an angle—Petitioner's body is facing the "west" stem wall, and Clemm's body is facing the "east" stem wall.  Petitioner is backing up with his arms up (primarily to balance against the walls as he backed up), and Clemm is pursuing him with outstretched arms.  There is a "slapping" sound, but it is unclear what made that sound.  Petitioner's left arm is extended toward Clemm, and it is impossible to see if Petitioner has a key in either hand.  Clemm is not staggering or leaning against a wall.

At second 2, Clemm puts his right hand against a large, black-and-white graphic art canvas hanging on the east stem wall, apparently for balance. Petitioner draws his right arm back and swings his right fist at Clemm's left side; it is unclear if he hits the art canvas or Clemm.  Now, both of Clemm's hands are resting against the wall for balance, but his feet are still moving toward Petitioner. At second 3, Petitioner swings again with his right fist, this time hitting Clemm on the left side of Clemm's chin.  At second 4, Clemm sinks to a seated position against the wall opposite from the art canvas, ending up leaning against the wall with his hands by his side, head bent forward toward the ground, and his legs outstretched.

At seconds 4 and 5, while Clemm is still seated with his hands down and head bowed, Petitioner swings his fists into Clemm's head in rapid-fire fashion, making contact at least twice, causing Clemm to fall over onto his right side on the rug, his hands still by his side.

For the next six or seven seconds, Petitioner repeatedly and forcefully strikes Clemm in the head with his fists and feet, including by stomping on Clemm's head. Pytel is heard saying, "Get up!" and she reaches out toward Petitioner; he

8

slaps her hand away and goes back to kicking and stomping on Clemm's head. Clemm does not move during the attack, except by the force of Petitioner's blows.

At seconds 13-14, Petitioner leaves the camera's field of view (heading "east" down the crossbar hall) going toward Pytel who is audible (saying "Babe, get up!") but not visible in this portion of the video clip. Petitioner says, "What? What?"

At seconds 15-16, Clemm slowly tries to lift his upper body off the floor with his arms. At seconds 17-18, Petitioner reenters the camera frame and strikes Clemm's head with his fists until Clemm is flat on the floor again.

At seconds 19-22, Petitioner is again off camera in the direction of Pytel. Petitioner says, "Come here." At seconds 23-25, Petitioner reenters the camera frame and leans over Clemm to speak to him, saying, "Get up, punk. Get up, punk."

b.     Video 2.

This is a 10-second video. It shows Clemm still on the floor. Petitioner leaves Clemm to approach Pytel, off camera. There are slapping sounds. Pytel yells, "Ow![5] Give me my – Babe, get up! He's got my phone!"

c.     Video 3.

This is a 15-second video. It shows Petitioner (with Pytel's glowing phone in hand) stepping over Clemm (still on the floor) and walking without haste toward the door at the far end of the stem hall, pursued by Pytel. She catches up with him at the door, says "Please give me my phone back," and reaches for her phone, at which point Petitioner grabs her and pushes her against the wall so that he can open the door and leave with the stolen phone.

---

[5] Pytel testified that she yelled, "Ow!" in response to Petitioner's slapping her arm into a wall, which sliced into her arm. (See 2 RT 128-32, 139.)

## IV.

### PROCEDURAL HISTORY

On September 26, 2014, a jury convicted Petitioner of assault by means likely to produce great bodily injury, second degree robbery, and intimidating a witness. (LD 1, 1 CT 113-16.)

Petitioner appealed his conviction. (LD 3.) Petitioner raised the same instructional error claim that he now raises in his federal Petition. (Id.) On September 15, 2016, the California Court of Appeal modified Petitioner's sentence but affirmed the convictions in a reasoned opinion. (LD 6.) Petitioner filed a petition for review in the California Supreme Court. (LD 7.) On November 22, 2016, the California Supreme Court summarily denied review. (LD 8.)

### V.

### STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), Petitioner is entitled to habeas relief only if the state court's decision on the merits "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court" or "(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Cullen v. Pinholster, 563 U.S. 170, 181 (2011).

The relevant "clearly established Federal law" consists of only Supreme Court holdings (not dicta), applied in the same context in which petitioner seeks to apply it, existing at the time of the relevant state court decision. Premo v. Moore, 562 U.S. 115, 127 (2011). A state court acts "contrary to" clearly established Federal law if it applies a rule contradicting the relevant holdings or reaches a different conclusion on materially indistinguishable facts. Price v. Vincent, 538 U.S. 634, 640 (2003). A state court "unreasonably appli[es]" clearly established federal law if it engages in an "objectively unreasonable" application to the facts of

the correct governing legal rule.  White v. Woodall, -- U.S. --, 134 S. Ct. 1697, 1705-07 (2014) (rejecting previous construction of section 2254(d) that a state court decision involves an unreasonable application of clearly established Supreme Court law if the state court "unreasonably refuses to extend a legal principle to a new context where it should apply").  Habeas relief may not issue unless "there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the United States Supreme Court's] precedents."  Harrington v. Richter, 562 U.S. 86, 103 (2011).  "[T]his standard is 'difficult to meet,'" Metrish v. Lancaster, 569 U.S. 351, 358 (2013), as even a "strong case for relief does not mean the state court's contrary conclusion was unreasonable."  Richter, 562 U.S. at 102.

The relevant state court decision is the last reasoned decision.  Ylst v. Nunnemaker, 501 U.S. 797, 806 (1991).  The federal court "looks through" subsequent unexplained decisions, assuming that those decisions denied relief on the same grounds as the last reasoned decision.  Id. at 804.  In the present case, the California Court of Appeal's decision on direct appeal is the relevant state court decision.  (LD 8.)

## VI.

## DISCUSSION

### A. Relevant Trial Court Proceedings.

The Court of Appeal summarized the trial court proceedings about Petitioner's requested self-defense jury instruction, as follows:

*Defense counsel requested a self-defense instruction, explaining that [Petitioner] did not make any physical contact with Clemm or Pytel when he entered their room and then left.  She stated, "we heard from Ms. Pytel who said that Mr. Clemm was standing behind [Petitioner] while she's yelling, 'Babe, grab the key.  Babe, grab the key.'  Mr. Clemm is 6-foot-3.  [Petitioner] is 5-foot-7.  … So you have this hulking man behind you who is saying, 'Give me the key.  Give me*

11

*the key.' … And then she admits that she reaches over and tries to grab the key. So now … [Petitioner] is, in effect, having two people behind him, both taller than he is, and I believe that self-defense is at issue here."*

*The trial court noted "it appears that the initiation or the initial contact, the initial punch was not captured by video" and asked if both counsel agreed. Counsel for both parties agreed. The court asked if [Petitioner] was going to testify. Defense counsel responded that it was not likely. The prosecutor argued there was no evidence to support a self-defense instruction. However, the trial court noted the inconsistency in Clemm's and Pytel's testimony regarding whether [Petitioner] pushed Pytel. It stated it did not know if, based on that inconsistency, "the jurors could, if they chose to, infer that the aggressor at that stage was, actually, Mr. Clemm in response to having seen his girlfriend struck by the [Petitioner]." The court stated it wanted to do some research and think about the matter. It thus took the matter under submission.*

*During a subsequent discussion on jury instructions, the trial court noted from its research on the issue of self-defense, "the court has to examine the record to determine whether there is substantial evidence in the record which would support giving the instruction. I know that the defense wants the instruction, but at this point, there is this void or gap in the case, in terms of facts, that would support the instruction[]."*

*Defense counsel pointed out there was a portion of the video in which Clemm was moving toward defendant, and [Petitioner] "is actually backing up." She argued this showed aggression on Clemm's part. In addition, she argued there was evidence of Clemm and Pytel, who were bigger than [Petitioner], behind him, trying to get the key from him. Based on that, defense counsel believed there was sufficient evidence to support an instruction on self-defense.*

*The trial court reviewed the witness testimony, including conflicts between Clemm's and Pytel's testimony. The court determined neither witness testified that*

12

*he or she touched [Petitioner] before [Petitioner] hit Clemm. It stated, "[t]here is*
*no evidence of that. The jurors may find that they don't believe that story. But it*
*doesn't give them an alternative story which then supports self-defense. There is*
*just this void, this gap. There is no evidence." The court further stated that there*
*was no evidence from which the jury could "make a determination that[,]*
*subjectively or objectively, the [Petitioner] felt the need to defend himself." The*
*trial court therefore denied the request for a self-defense instruction.* (LD 6 [Dkt.
25-9 at 5-6], citing LD 2 [2 RT 158-162, 301-303, 335-36, 359-67].)

The judge ultimately instructed the jury regarding the mental state necessary
to be guilty of assault with force likely to produce great bodily injury. (1 CT 87,
89, 100.)

In closing argument, defense counsel argued that Petitioner was simply
looking for a place to sleep the night he knocked on Clemm and Pytel's hotel room
door; he was dressed for sleeping and not attempting to conceal his identity. (3 RT
677.) Defense counsel argued that Petitioner would not have hit Clemm if Clemm
had not pursued him into the hallway. (3 RT 678.) Defense counsel argued that
Clemm misconstrued what he saw (i.e., he thought Petitioner had pushed Pytel,
while Pytel testified that she was grabbing for the room key) and became angry
and advanced towards Petitioner. (3 RT 678-79.)

The prosecutor argued that defense counsel "is basically presenting you [the
jury] with this idea of a potential self-defense. The problem is that that does not go
towards the assault as you have been instructed on it." (3 RT 686.) The prosecutor
argued that defense counsel "is asking you to imagine a scenario where
[Petitioner's] somehow being attacked. We don't see that on the video, and that's
actually not consistent with the testimony of the two victims." (Id.) The
prosecutor pointed out that even after Petitioner knocked Clemm down, he did not
run away, but continued to stomp on him and taunt him. (3 RT 688.) The
prosecutor concluded that the "main reason" the jury should "think critically"

13

about the defense theory is "because you've been given instructions for what you're supposed to be asking with regard to the assault. … Look at those questions. Do any of those questions address … how he [Petitioner] felt? … Those are the questions you are supposed to answer. That is the law you're supposed to follow." (3 RT 688-89.)

**B.** **The Court of Appeal's Decision.**

On appeal, Petitioner argued that sufficient evidence existed to raise a reasonable doubt as to whether Petitioner acted in self-defense, thereby entitling him to the instruction. Petitioner pointed to evidence that Clemm was eight inches taller[6] and that Video 1 showed "Clemm was pursuing [Petitioner] around the corner of the hallway when [Petitioner] turned and punched Clemm," after which Clem "repeatedly tried to get up." (LD 3 [Dkt. 25-6 at 18-19, citing 2 RT 85 and 98].)

The California Court of Appeal rejected Petitioner's claim of error, reasoning as follows:

> *The trial court must instruct the jury on a defense on request by the defendant only if the defense is supported by substantial evidence. (<u>People v. Nguyen</u> (2015) 61 Cal.4th 1015, 1049 …; <u>People v. Lee</u> (2005) 131 Cal.App.4th 1413, 1426 ….) "'Substantial evidence is "evidence sufficient 'to deserve consideration by the jury,' not 'whenever any evidence is presented, no matter how weak.'" [Citations.]" (<u>People v. Wilson</u> (2005) 36 Cal.4th 309, 331 …; <u>accord</u>, <u>People v. Larsen</u> (2012) 205 Cal.App.4th 810, 823 ….) "In determining whether the evidence is sufficient to warrant a jury instruction, the trial court does not determine the credibility of the defense evidence, but only whether 'there was evidence which, if believed by the jury, was sufficient to raise a reasonable doubt*

---

[6] Clemm testified that he was 6 feet 3 inches tall, and he did not know how tall Petitioner was, but he estimated 5 feet 7 or 8 inches. (2 RT 85.)

...' [Citations.]" (*People v. Salas* (2006) 37 Cal.4th 967, 982-983, ...; *accord, Larsen, supra*, at pp. 823-824.)  The court must resolve any doubts regarding the sufficiency of the evidence in favor of the defendant.  (*Larsen, supra*, at p. 824.)

"'To justify an act of self-defense for [an assault charge under ... section 245], the defendant must have an honest and reasonable belief that bodily injury is about to be inflicted on him. [Citation.]' [Citation.] The threat of bodily injury must be imminent [citation], and'... any right of self-defense is limited to the use of such force as is reasonable under the circumstances. [Citation.]' [Citations.]" (*People v. Minifie* (1996) 13 Cal.4th 1055, 1064-1065 ....)  The reasonableness of the defendant's belief in the need for self-defense is evaluated objectively, and "reasonableness is determined from the point of view of a reasonable person in the defendant's position.  The jury must consider all the facts and circumstances it might '"expect[] to operate on [defendant's] mind ..." [Citation.]' [Citation.]" (*Id.* at p. 1065.)

As the trial court found, there was no evidence [Petitioner] actually believed he was in imminent danger of suffering bodily injury at the hands of Clemm and Pytel.  They did not threaten any sort of physical harm; they were merely demanding that he give them the key to their room.  That [Petitioner] was not in fear of any physical harm is evidenced by the fact that when Pytel told Clemm to grab the keys from [Petitioner], he responded with the threat, "I wouldn't do that if I were you."

[Petitioner] argues that it would have been reasonable for him to believe he was in imminent danger of bodily injury because Clemm was significantly taller than he was.  But "'self-defense requires both actual subjective belief and objective reasonableness.'"  (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1093 ... (conc. opn. of Brown, J.); *accord, People v. Butler* (2009) 46 Cal.4th 847, 868 ....)  Absent evidence [Petitioner] was in actual fear of imminent bodily harm, no instruction on self-defense was required.

15

*Moreover, the right to self-defense extends for "only as long at the danger exists or reasonably appears to exist." (*People v. Clark* (2011) 201 Cal.App.4th 235, 250 ....) Even if [Petitioner] was justified in punching Clemm as he grabbed for the keys, he was not justified in continuing to punch and kick Clemm as he lay on the ground. There is no evidence [Petitioner] actually or reasonably believed he was in imminent danger of bodily injury when he continued his attack on the prostrate Clemm and then told him, "[g]et up, punk." The trial court did not err in refusing to instruct the jury on self-defense.* (LD 6 [Dkt. 25-9 at 8-9].)

## C.    <u>Clearly Established Federal Law.</u>

Due process requires that "criminal defendants be afforded a meaningful opportunity to present a complete defense." <u>Clark v. Brown</u>, 450 F.3d 898, 904 (9th Cir. 2006) (quoting <u>California v. Trombetta</u>, 467 U.S. 479, 485 (1984)). A criminal defendant is entitled to adequate instructions as to "any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor." <u>Mathews v. United States</u>, 485 U.S. 58, 63 (1988); <u>see, e.g.</u>, <u>Bradley v. Duncan</u>, 315 F.3d 1091, 1099 (9th Cir. 2002) (holding that failure to instruct on entrapment violated defendant's due process rights); <u>Conde v. Henry</u>, 198 F.3d 734, 740 (9th Cir. 1999) (holding that failure to instruct on simple kidnapping violated defendant's due process rights).

"[A] state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." <u>Bradshaw v. Richey</u>, 546 U.S. 74, 76 (2005). Thus, whether there was sufficient evidence of self-defense presented at trial to trigger a duty to instruct the jury on self-defense turns on how California law defines the elements of self-defense.

Even if constitutional error has occurred, a petitioner is not entitled to federal habeas relief unless the error "in the whole context of the particular case, had a substantial and injurious effect or influence on the jury's verdict." <u>Calderon</u>

16

v. Coleman, 525 U.S. 141, 147 (1998) (citing Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)); Stephens v. Harrington, No. EDCV 09-00191-SS, 2011 U.S. Dist. LEXIS 104812, at *46 (C.D. Cal. Sep. 15, 2011) (applying Brecht harmless error test where trial court refused to instruct jury on self-defense).

**D.      The Court of Appeal Reasonably Rejected Petitioner's Claim.**

The Court of Appeal first explained that under California law, self-defense requires both a subjective/actual and objective/reasonable belief that one is facing imminent bodily injury.  The court found that there was no evidence Petitioner was afraid of Clemm; to the contrary, the evidence showed he was not (e.g., returning to the room, refusing to return the key, threatening Clemm verbally, remaining in the hall, taunting Clemm to get up).  While Petitioner argued that a reasonable person would have been afraid of Clemm, given his height and movement toward Petitioner, a jury could not infer that Petitioner was actually afraid of Clemm when evidence showed that he was not.  Moreover, the evidence could not support a jury finding that Petitioner used only such force as was reasonable under the circumstances, i.e., only the force reasonably necessary to repel Clemm's threat of bodily injury.[7]

**1.  The Objective Inquiry.**

To assess whether a belief that bodily injury was imminent was objectively reasonable, a jury must consider what "would appear to be necessary to a reasonable person in a similar situation and with similar knowledge."  People v. Humphrey,13 Cal. 4th 1073, 1082 (1996).  The issue is not whether defendant, or a person like him, had reasonable grounds for believing he was in danger.  It is

---

[7] A defendant is justified in using "such force as was reasonably necessary to repel the assault, if [the jury] found there was any assault on defendant."  People v. Mesa, 121 Cal. App. 345, 349-50 (1932) (citing People v. Campbell, 30 Cal. 312, 314 (1866) ["It is an elementary principle in criminal law that the person assaulted, is justified in using so much force as is necessary to his defense."]).

instead whether a person of ordinary and normal mental and physical capacity would have believed he was in imminent danger of bodily injury under the known circumstances. People v. Brady, 22 Cal. App. 5th 1008, 1014 (2018) (citing People v. Jefferson, 119 Cal. App. 4th 508, 519-20 (2004)).

Petitioner argues that a permissible inference from the video evidence is that Petitioner "had to punch and kick Clemm several times in order to protect himself against the initial aggression of Clemm." (Dkt. 1 at 20; Dkt. 28 at 3.) The video shows Clemm pursuing Petitioner into the stem hall and reaching towards Petitioner; this is consistent with Clemm demanding the key and reaching for it. Nothing in the video shows Clemm punching Petitioner, balling his fists, or cocking his arm for a blow. But even assuming that an ordinary person pursued by Clemm as shown in Video 1 would have believed that Clemm posed an imminent danger of bodily injury, no evidence supported the other necessary self-defense elements, as discussed below.

### 2. The Subjective Inquiry.

No evidence presented at trial suggested that Petitioner believed that bodily injury was about to be inflicted on him. In fact, the evidence showed the opposite. While Clemm was taller than Petitioner, Clemm got out of bed during their first encounter, such that Petitioner could see his height. (2 RT 33.) Even after Petitioner had seen Clemm's height, Petitioner was not afraid to lie to him (claiming to be from guest services) or insult him (asking whether Clemm was a porn star). (2 RT 36.) When Clemm told Petitioner not to return to their room, Petitioner laughed and said that he would return, and he did return about twenty minutes later and unlocked the door again. (2 RT 87-88, 121.) He laughed again when Clemm told him, "I told you not to come back." (2 RT 123-24, 146.) He refused Clemm's request to hand over the key – a key that Petitioner knew did not belong to him and fit Clemm's hotel room door. (2 RT 42.)

Clemm followed Petitioner into the hallway after Petitioner's second attempt

18

to enter Clemm and Pytel's hotel room without permission in the middle of the night. But Clemm testified that he did not yell at Petitioner or get closer than arm's length, did not push Petitioner, did not hit Petitioner, and did not attempt to hit Petitioner. (2 RT 45, 95, 107, 111.) Pytel testified that she told Clemm to try to grab the key, at which point Petitioner threatened, "I wouldn't do that if I were you." (2 RT 126.) Clemm testified that Petitioner delivered the first punch after Clemm saw Petitioner push Pytel and Clemm told Petitioner, "Don't push my girlfriend." (2 RT 45, 93-94, 111.) While there is contradictory evidence about the immediate circumstances preceding Petitioner's first blow (as discussed below), video evidence shows that Petitioner repeatedly hit and kicked Clemm, rendering him unconscious, and then continued to beat Clemm and taunt him as Clemm lay on the ground, not moving. (2 RT 45-48.) As shown in Video 1, after knocking Clemm to the ground, Petitioner did not immediately leave the third-floor hall; he continued to hit and kick Clemm. He also stayed long enough to call Clemm a "punk" twice and forcibly take Pytel's phone, apparently unconcerned that Clemm might try to fight back. After leaving the third floor at a leisurely pace, Petitioner did not seek help; he stayed in the hotel and was arrested there. (2 RT 55-56, 340, 349.) When the police arrived, he lied to them, saying that he was authorized to stay in room 203 with his girlfriend. (2 RT 325, 353-54.) In light of this evidence, the California Court of Appeal reasonably found that no reasonable juror could have found that Petitioner had an honest and reasonable belief that Clemm was about to inflict upon him bodily injury.[8]

----

[8] Petitioner implies that if a reasonable person would have feared an assault by Clemm, then the jury could have inferred that Petitioner feared an assault by Clemm. (See Dkt. 28 at 3.) The Court of Appeal reasonably rejected that argument. The evidence shows that Petitioner did not *in fact* have an honest and reasonable belief that bodily injury was about to be inflicted on him.

### 3. Reasonably Necessary Force.

Regardless of the outcome of the objective and subjective inquiries, no evidence could have supported a jury finding that Petitioner responded to a perceived threat from Clemm with only the degree of force necessary to repel it, and only as long as the danger reasonably appeared to exist.  At most—and viewed generously—the first second of Video 1 *may* depict Clemm's hands coming into contact with Petitioner's hands or arms as Clemm and Petitioner advanced into the stem hallway.  But after knocking Clemm to the floor, Petitioner continued to strike and kick Clemm repeatedly, even stomping on Clemm's head, while Clemm lay on the floor, motionless.  Petitioner even stepped away from Clemm to taunt Pytel, then returned to Clemm to begin striking him again as Clemm—clearly incapacitated—struggled to push himself into a seated position.  There is no video or other evidence that Clemm ever yelled at Petitioner, threatened Petitioner, punched Petitioner, or did anything other than attempt to get the key to his room back from Petitioner, who had broken into Clemm's room twice.

Petitioner argues that "the video evidence shown to the jury is directly contrary to the testimony of Clemm, and represented substantial evidence justifying the self-defense instruction." (Dkt. 1 at 19.)  The alleged conflict between the video evidence and Clemm's testimony is that Clemm testified that the first punch (i.e., Petitioner hitting him) is not shown on the video and the first punch "knocked him to the ground," but the punch that knocked Clemm to the ground *is* shown on the video.  (Id.)  Petitioner argues that if the video showed that Clemm lied about how the first punch occurred, then it supports an inference that he also lied about not throwing the first punch.

The Court agrees that there is a conflict between Clemm's testimony describing the first punch and the video evidence.  A reasonable juror could have relied on this conflict to reject Clemm's testimony that Petitioner shoved Pytel before punching Clemm, and that Petitioner first punched Clemm off-camera

rather than in Video 1.  The Court of Appeal reasonably determined, however, that Petitioner did not use force that was reasonable under the circumstances, and that he continued to use force after any threat had dissipated; thus, there was insufficient evidence to warrant a self-defense instruction.

**E.      Petitioner Has Not Shown Prejudice under _Brecht_.**

Even if the trial court had committed error by failing to instruct on self-defense, Petitioner has not shown that the trial error had a substantial and injurious effect or influence in determining the verdict.[9]  Petitioner's evidence supporting a self-defense instruction borders on non-existent.  Given all the evidence laid out above, there is no doubt in the Court's mind that the jury would have rejected the idea that Petitioner acted in self-defense.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

---

[9] The California Court of Appeal did not discuss the Brecht prong.  In 2005, the United States Supreme Court stated in Rompilla v. Beard that in a situation where the state courts address one prong of the two-prong test for ineffective assistance of counsel, but not the other, federal courts apply AEDPA deference to the prong the state courts reached, but review the unaddressed prong de novo. 545 U.S. 374 (2005).  In 2011, however, the United States Supreme Court explained in Harrington v. Richter that it does not matter "whether or not the state court reveals which one of the elements in a multipart claim it found insufficient" because the relevant question is whether a "'claim,' not a component of one, has been adjudicated." Richter, 562 U.S. at 98.  The Ninth Circuit has not yet resolved this issue.  The Seventh Circuit has addressed the conflict by construing Richter to apply only where the state court decision is "unaccompanied by an explanation." Sussman v. Jenkins, 642 F.3d 532, 534 (7th Cir. 2011).  Under either de novo review or the standard set out in Richter, Petitioner has not shown prejudice.

# VI.

## ORDER

Accordingly, IT IS ORDERED that Judgment be entered denying the Petition and dismissing this action with prejudice.

DATED:  August 27, 2018

_____
KAREN E. SCOTT
United States Magistrate Judge